1

HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

7

8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
9
AT TACOMA

10

DAVID LYNCH, a single man

11
Plaintiff,                          Case No.C09-5050RBL

12

13
v.                                  ORDER ON SUMMARY JUDGMENT
                                    [Dkt. #58]
14
AARON JELCICK, CITY OF OLYMPIA,
et al.,

15

16
Defendants.

17

18

19

20          THIS MATTER is before the court on Defendants' Motion for Summary Judgment. [Dkt. #58] The

21   case arises from the detention and  arrest of Plaintiff David Lynch in February 2007, hours after the rape of

22   an eleven year old girl in her nearby home. Mr. Lynch did not commit the crime.

23          Before DNA evidence determined his innocence, however, Mr. Lynch was stopped, detained, arrested,

24
     searched, transported to the police station and held at Thurston County Jail, and eventually  transferred to
25
     Western State Hospital for evaluation.  While he was in custody, Plaintiff developed deep vein thrombosis
26
     and a saddle pulmonary embolism, and had a psychological breakdown.
27

28    ORDER
      Page - 1

Plaintiff sues for false arrest and imprisonment, for unreasonable search and seizure, negligence, and deliberate indifference. [Dkt. #17, amended Complaint].  The Defendants are Olympia Police Sergeant Jelcick, Officer King, the Olympia Police Department, the City of Olympia, Sheriff Kimball, Thurston County, and Healthcare Delivery Inc.

The moving "Olympia Defendants" (King, Jelcick, and the City of Olympia) seek summary dismissal of all of Plaintiff's claims against them, arguing that their initial stop of Mr. Lynch was a justified *Terry* stop, they had probable cause to arrest him and to obtain a search warrant, that no earlier *Miranda* warnings were required, and that the Defendants are entitled to qualified immunity in any event.

For the reasons that follow, the Olympia Defendants' Motion is GRANTED and Plaintiffs' claims against these Defendants are DISMISSED WITH PREJUDICE.

**I.     Facts**.

Because much of the record consists of contemporaneous writings and transcripts, and because Mr. Lynch has provided only limited testimony about the events, most of these underlying facts are undisputed.

Early in the morning of February 5, 2007, an eleven year old girl was raped and partially strangled in her home.  The back door had been left closed, but not locked.  After the incident, the girl's mother saw that the door was slightly open.   The girl briefly had her light on and was able to see her attacker.  She gave the investigating officer, Officer Amy King, a description that included the following attributes:

- The attacker was 'about an inch taller than her mom" and not fat or skinny but medium."

- He had black hair that was "just flat" not curly or wavy, and long enough for her to grab.

- He had a small mustache and a beard that was "just a little bit off his chin."

- He had glasses with white frames and lenses that were "medium circles."

- He was 18 or 20

ORDER
Page - 2

- His skin was light brownish, a little bit darker than her own [Caucasian].

[Dkt. #61; King Dec.]

Early on February 6 (shortly after midnight), Officer Hovda observed a male sitting outside the Latter Day Saints Church located a few blocks from the victim's house. Because of the time and the proximity to the crime, the officer approached the man, Mr. Lynch. Lynch was writing in a notebook at the time. Hovda asked why he was there, but he did not answer. Hovda called for backup. After several attempts, Lynch finally told Hovda his name. Hovda claims he observed the following about Mr. Lynch:

- He was about 5'7" tall, and weighed about 125 pounds, which was confirmed when Lynch showed Hovda his ID.

- He had dark hair pulled tight on his head and in a pony tail.

- He had a small mustache and goatee.

- He was not then wearing glasses, but his ID photo showed him with glasses.

- He appeared to be in his early 20s; his ID showed that he was 24. [Dkt. #62; Hovda Dec.]

- Hovda also learned from Lynch that he was there because he did not like or get along with people, and was looking in the dumpster for food.

- Lynch admitted he was in Watershed Park (even nearer the victim's home) the night before.

- He said he did something he "felt bad about" the previous night , and, according to Hovda, his eyes became watery as he did so. When asked if he had "hurt someone last night" he said he "thought so."

- He was asked if he entered a house and he said he "did not break into a house." According to Hovda, Lynch emphasized the word "break." [Dkt. #61]. Hovda believed that Lynch was being intentionally evasive and was not being entirely truthful.

ORDER
Page - 3

Sergeant Jelcick then questioned Mr. Lynch.  He told Lynch that he knew he could communicate, and Lynch became more communicative.  He was not given a *Miranda* warnings.   According to Jelcick, Lynch made some general statement about being "evil."

Lynch provided no more information, and said he wanted to talk to an attorney.  Hovda and Jelcick believed they had probable cause to arrest Mr. Lynch, and asked him to go with them to the Detectives Office, and he agreed to go with them.  They testify that they would have arrested him and taken him with them at that point if he did not so agree.

The officers then called Officer King and told them about Mr. Lynch.  She called Thurston County Superior Court Judge Richard Strophy at 3:27 a.m. on February 6, in an effort to obtain a search warrant.  After a lengthy call, Judge Strophy orally issued a search warrant for "major prints," DNA swabs, fingernail scrapings and hair. [King Dec., Dkt. #61 at Ex. 1]   Mr. Lynch was then arrested (and read his *Miranda* rights), and the warrant was executed.  At about 7:30 a.m., he was transported to the jail.

Shortly thereafter, the victim was shown a photo montage of six persons, including Mr. Lynch without his glasses.  She did not identify any of the six as her attacker.  According to the Defendants, incident to his arrest, Mr. Lynch's backpack was searched and the content of his journals was read.  Included were entries about needing to get over this f***ed up child hurter [or hunter] thing;" thoughts about "raping his teacher;" and "I am a horrible person."

It was also discovered that Mr. Lynch had been living in a "bunker" in Watershed Park.  In an effort to obtain a search warrant for that bunker, Detective King again telephoned Judge Strophy.  She told him about the journal entries, but not about the photo montage and the victim's failure to identify Mr. Lynch.  The warrant was issued, and the bunker was searched.  The results of that search do not appear to be material to Mr. Lynch's innocence or guilt, or to the issues in the case.

On February 8, the Deputy Prosecuting Attorney filed a Declaration in Support of Probable Cause. Judge Strophy entered the Determination of Probable Cause and an Order Authorizing Summons and Detention on February 8.  He also entered an Order for a 15 Day Evaluation at Western State, to determine his competency to stand trial.  Lynch's DNA did not match that taken at the crime scene and the charges were dismissed without prejudice on February 21.

Plaintiff's claims against King Jelcick and the Olympia Police Department are based on his claim that the Officers did not have the requisite reasonable suspicion for a *Terry* stop,  that there was no probable cause to obtain a search warrant, and that Detective King misrepresented and omitted facts to Judge Strophy in order to obtain it.  He argues that Lynch had the right not to answer the Officers' questions, and that he was entitled to  *Miranda* warnings prior to the time he was questioned. His primary complaints are about the Officers' development of probable cause based on the description of the attacker given by the victim, and more specifically about the alleged mismatch between what King was told about Lynch's appearance and clothing, and what King told Judge Strophy about those descriptions.

Lynch points out that Officer King took a 34 page detailed statement from the victim on the morning of February 5. There, she described the attacker's black, flat hair, about the length of her brother's.  He had brown sweat pants, a light blue jacket, and a t-shirt. She said the attacker's skin was "light brownish."  He was 18-20 years old, wearing medium, circular glasses, medium build, about 5'6" tall.  She also described a "little mustache" and a little beard just off his chin, in a point.

In her telephone conference with Judge Strophy, Lynch emphasizes, King said that the perpetrator had dark, like black hair, straight and not long but long enough to grab.  He had glasses, light facial hair, 5'7" tall and 18-20 years old.  She described cargo type pants, maybe brown, and a pullover top, and maybe a blue t-shirt underneath.  King told the Judge that the victim did not describe a jacket, and that the pants matched the

 ORDER
Page - 5

victim's description, as did the hair and facial hair.  A detailed comparison of Lynch's appearance and clothing, what the victim described, and what King told Judge Strophy about Lynch's appearance in her first conversation with him, is outlined in a chart on page 8 of the Plaintiff's Response [Dkt. #67] For purposes of this Motion, of course, all facts are viewed in the light most favorable to the non-moving party.

**II.      Discussion**.

**A.      Summary Judgment Standard**.

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

**B.      Lynch's Claims Against the City.**

Plaintiff Lych alleged in his complaint that the City was liable for the alleged violation of his Constitutional rights as it had a practice or policy of disregarding suspects' rights.  His Response to the City Defendants' Motion does not address this claim.  He has not met his summary judgment burden of making out a prima facie case against the City for violations of his Constitutional rights under *Monell*.  The City's

Motion on these claims is GRANTED, and these claims are DISMISSED with prejudice.

**C.    Lynch's claims against Officer King and Sergeant Jelcick.**

Mr. Lynch does not assert any claims against Officer Hovda, who is the officer that initially spoke to him and (along with Sergeant Jelcick) was responsible for taking him to the station after he was questioned. [*See* Second Amended Complaint, Dkt. #57] Lynch claims that Officer King violated his constitutional rights by approaching and questioning him without probable cause, without giving him *Miranda* warnings, and by arresting him and then detaining him without probable cause. He also asserts state law false arrest and false imprisonment claims against King.

King and Jelcick's Motion for Summary Judgment is based on their contention that the initial stop of Mr. Lynch was a legitimate *Terry* stop, that that stop resulted in probable cause to arrest Mr. Lynch, that he voluntarily accompanied the officers to the station, and that the subsequent *Miranda* warnings and arrest were proper. King and Jelcick argue that probable cause is also a complete defense to Plaintiff's state law false arrest and false imprisonment claims. They also claim that even if any of their actions were improper, they are entitled to qualified immunity.

**1.    Qualified Immunity Standard.**

Pursuant to the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818,(1982). In analyzing a qualified immunity defense, the Court must determine first, whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and then, whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant dispositive

 ORDER
Page - 7

inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* The privilege of qualified immunity is an immunity from suit rather than a mere defense to liability, and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. *Id.*

The Supreme Court has recently held "that the *Saucier* protocol should not be mandatory in all cases . . . [but] it is often beneficial." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). In this case it is beneficial to first determine whether a constitutional right was violated before moving to the second question of whether the right was clearly established. Each of Plaintiff's Constitutional claims will be addressed in turn, and, if necessary, the second step of the qualified immunity analysis will follow.

## 2.    Validity of Initial *Terry* Stop.

Defendants' primary defense to Plaintiff Lynch's claim is that he was the subject of a legitimate *Terry* stop and that the information gleaned from that stop resulted in probable cause to arrest Mr. Lynch for the attack. Plaintiff argues that in order for the officers to even have detained Mr. Lynch, there must have been probable cause." [Plaintiff's Response, Dkt. #67, at 11]  This is not the law, under either the United States or Washington Constitutions.

Under *Terry v Ohio*, 392 U.S. 1, 30 (1968), an officer may make a "founded (or reasonable) suspicion stop  if he has reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *See also U.S. v. Sokolov*, 490 U.S. 1, 7 (1989). Founded suspicion is not a matter of hard certainties, but of probabilities, and it requires more than an officer's "hunch," even a hunch that later turns out to be a good one. Reasonable suspicion can arise from information different in quality and content and even less reliable than that required for the establishment of probable cause. *See U.S. v. Mattorolo*, 209 F.3d 1153, 1157 (9th Cir. 2000)(internal citations omitted). In determining whether reasonable

ORDER
Page - 8

suspicion exists to justify a brief detention to determine an individual's identity and to maintain the status quo while verifying or dispelling suspicion that criminal activity is occurring or contemplated, the court must consider the "totality of the circumstances."  *U.S. v. Osborn*, 203 F.3d 1176, 1181 (9ᵗʰ Cir. 2000)(internal citations omitted.)  Approaching and questioning someone does not constitute a seizure.  *United States v. Summers*, 268 F.3d 683 (9th Cir. 2001); *People v. Melton*, 910 P.2d 672 (Colo. 1996).  Whether a police officer has made a *Terry* stop is a mixed question of law and fact.  *See United States v. Torres-Sanchez*, 83 F.3d 1123, 1127 (9th Cir. 1996).  Cases decided under the Washington Constitution adopt this standard; they are not inconsistent with it.  *See State v. White*, 97 Wn.2d 92 (1982) (measuring a prior state "stop and identify" statute against the protections of the Fourth Amendment).

From his initial sighting of him, Officer Hovda observed that Mr. Lynch was sitting alone in an empty church parking lot late at night, very near where the rape had occurred approximately 24 hours before. Criminal activity had been afoot, recently, in that area[1]. Hovda observed that Lynch was similar in appearance to the description of the attacker that was given by the eleven year old rape victim. He was a similar age, weight and height. He was white, and had hair that was "flat" but long enough to "grab."  He had a thin mustache and a small goatee or beard.

Under these circumstances, and viewing the evidence in the light most favorable to the Plaintiff, the court must conclude as a matter of law that the officers were justified in approaching Mr. Lynch and engaging him in a *Terry* stop.  Specific and articulable facts, along with reasonable inferences from those facts, show that Officers Hovda and Jelcick were reasonable in making a *Terry* stop of Mr. Lynch. These facts include the

---

[1]Plaintiff also appears to claim that Sergeant Jelcick's order of "increased patrols" in the victim's neighborhood – meaning for them to "spend as much time as possible in those areas, and look for things that did not fit in the neighborhood"– was "unconstitutional on its face." *See* Plaintiff's response [Dkt. #67 at pp. 3 and 18].  This claim is not supported, and is not supportable. Such efforts are part and parcel of the sort of police work the public rightfully demands and expects.

ORDER
Page - 9

similarity in age, weight, height, skin color, hair, facial hair, and clothing.  They include the fact that Mr.
Lynch was sitting at a church late at night, alone, writing in a notebook, near in time and place to where a crime
had occurred.

Similarly, the officers' ensuing discussion with Mr. Lynch was permitted.  This discussion led to the
officers' belief that Mr. Lynch was being evasive and dishonest in his answers to their basic questions.   The
officer's pre-*Miranda* questions of Mr. Lynch – who are you, why are you here, what are you doing, etc., were
permissible under *Terry* as a matter of law.  Lynch initially refused to even speak to the officers, and later did
so evasively.  These were additional factors supporting their suspicion of him.  The answers that Lynch admits
he eventually gave – yes he thought he hurt someone the previous night, no he did not *break* into a house –
only increased the officer's suspicions about him.

In support of his claim that the officers did not have probable cause to conduct a *Terry* stop, Plaintiff
urges the court to focus on the fact that "none of the clothes he was wearing" matched the description given
by the victim. It may be true that the shades of hair and skin and clothes did not exactly match the hair skin
and clothes described, but they were similar.  The person providing the description was an eleven year old girl
who had been partially strangled and raped, mostly in the dark, immediately before giving the description.

No reasonable jury could conclude on the totality of this evidence that the officers did not have the
requisite  reasonable suspicion to engage Mr. Lynch in a *Terry* stop.  Plaintiff has not established a Federal or
State Constitutional violation based on the officer's initial stop of him.

And, even if the facts supported Plaintiff's claim of a Constitutional violation based on the initial stop
and questioning of him, the officers involved (and Jelcick) would be entitled to qualified immunity because
Plaintiff has not and cannot establish that a reasonable officer would have known that they would be violating
his Constitutional rights in asking him the basic questions that both parties agree he was asked.

ORDER
Page - 10

Defendants' Motion for Summary Judgment on the Plaintiff's Constitutional violation claim based on the initial *Terry* stop is therefore GRANTED and that claim is DISMISSED WITH PREJUDICE.

### 2.   Timeliness of *Miranda* warnings.

Plaintiff makes a related claim that his Constitutional rights were violated when he was questioned in the parking lot without *Miranda* warnings.  He does not mention the Fifth Amendment, and does not make this allegation against the first officer to question him, Officer Hovda.  Mr. Lynch was not arrested, and *Mirandized*,  until six and a half hours after he was initially stopped.

Defendants seek summary judgment on this claim, arguing that Mr. Lynch was not subject to a custodial interrogation during the questioning at the church parking lot, and that *Miranda* warnings were not required at that time.  They argue that the officers' initial questioning was permissible as part of the *Terry* stop discussed above, and emphasize that no additional evidence leading to his arrest was gathered from the time of that initial questioning and the time Mr. Lynch was subsequently *Mirandized*.

A coerced statement obtained in violation of a suspect's Fifth Amendment (*Miranda*) rights can be the basis for a §1983 claim, even when the evidence gathered is not used against the suspect in a trial.  *See*, for example, *Crowe v. County of San Diego*, 593 F.3d 841 (9th Cir. 2010).  It is actionable when the coerced statement is used in a criminal case against suspect.  When this "case" commences is not always clear, but it does occur when the statement is relied upon to file formal charges against the defendant.  *See Stoot v. City of Everett*, 582 F.3d 910, 925 (9th Cir. 2009).  But in order to implicate a suspect's *Miranda* rights, the statement must be coerced.  Put another way,  *Miranda* rights are implicated only to custodial interrogation. He must have been taken into custody or otherwise deprived of freedom of action in a significant way. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

ORDER
Page - 11

Plaintiff's claim that his *Miranda* rights were violated is dependent on his establishing that he was subject to a custodial interrogation at the church. To make this determination, the court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest. *See Stansbury v. California*, 511 U.S. 318, 322 (1994).

Plaintiff contends that because he felt "intimidated" and did not think the officers would let him leave, he was in custody for purposes of his entitlement to *Miranda* warnings before he answered their questions. While the belief of the suspect as to his degree of freedom is to be considered, the relevant inquiry is how a reasonable man in the suspect's situation would have understood the situation. *See Stansbury* at 325. The officers' questions were brief, and consistent with a non-custodial *Terry* stop. Mr. Lynch was not confronted with evidence of guilt (other than his own statements), was questioned where he sat, and the pressure applied was not great, even by his own account. *Cf. Crowe*, 593 F.3d 841 (four isolated interrogations over several hours, suspects were cajoled, threatened, lied to and relentlessly pressured by teams of officers). The officers' questioning did lead to evidence (and probable cause) implicating Mr. Lynch, but that questioning was, as a matter of law, done in the context of a valid *Terry* stop, not a custodial interrogation requiring *Miranda* warnings.

Based on these facts, a reasonable jury could not find that the officers violated Mr,. Lynch's Constitutional right against self incrimination when they questioned him outside the church.

And even if a Constitutional violation was present, the officers are entitled to qualified immunity because it is not and was not clearly established that officers confronting an individual in the context of the Defendants' contact with Mr. Lynch could not, as the Plaintiff contends, question him at all in the absence of *Miranda* warnings.

ORDER
Page - 12

For these reasons, the Defendants' Motion for Summary Judgment on the Plaintiffs' *Miranda* warnings claim is GRANTED, and this claim is DISMISSED with prejudice.

**3.     Development of Probable Cause to Arrest Mr. Lynch.**

Plaintiff's second misapprehension about the probable cause leading to his arrest is his claim that "the probable cause in this case was tainted by the manner in which Detective King manipulated the information she provided to Judge Strophy in obtaining the warrants.  Without the tainted information or omissions, probable cause could not have been established." [Plaintiff's Response, Dkt. #67, at 6].

Defendants argue that the probable cause necessary to arrest Mr. Lynch for the rape was developed through their initial questioning of him at the church.   They specifically do not argue that probable cause was developed during Detective King's telephone conversation with Judge Strophy, or from the issuance or execution of the resulting search warrant.

Probable cause exists when the facts and circumstances within the officers' knowledge are sufficient to cause a reasonably prudent person to believe that a crime has been committed.  *See Ybarra v. Illinois,* 444 U.S. 85, 91 (1979); *United States v. Jensen*, 425 F.3d 698 (9th Cir. 2005) (The test is whether, at the time of the arrest, the facts and circumstances within the officers' knowledge were sufficient to warrant a prudent person in believing that [plaintiff ]had committed or was committing an offense.)

It is true that, chronologically, the officers formally arrested him after the search warrant was issued.  But the Defendants do not claim that the probable cause to arrest him was based on anything Judge Strophy said or did, on the search warrant[2] itself, or on anything they learned in the subsequent search**.**  Indeed, they argue instead that they would have arrested Mr. Lynch at the time they asked him to come with them, had he not agreed to do so. The Plaintiff's claim that there was no probable cause absent the

---

[2]It must be emphasized that the search warrant led *only* to evidence which, in the end, exonerated Mr. Lynch; he was not arrested,  jailed or sent to Western State, or charged based on any evidence obtained through either search warrant.

ORDER
Page - 13

search warrant, and that because the warrant was tainted, probable cause was lacking, is erroneous as a matter of law.

The probable cause to arrest Mr. Lynch was not based on the search warrant, or the evidence to which it led, and no reasonable juror could find that it was. Instead, probable cause was established at the time the officers learned from Mr. Lynch during the *Terry* stop that he thought he had hurt someone the night before, was in the neighborhood where the rape occurred, and he claimed that he had not "broken" into a home. The Plaintiff's claim that the probable cause was based on an erroneous search warrant is not actionable on these facts, because the probable cause was not based on the search warrant or the resulting search, at all.

Furthermore, the defendants are entitled to qualified immunity on Mr. Lynch's claim that they arrested him without probable cause. In *Crowe v. County of San Diego*, the Ninth Circuit recently reiterated that officers are entitled to qualified immunity where they reasonably believe probable cause exists, even if it does not:

> The Supreme Court has held that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present." When that happens, the officials should not be held personally liable. We have held that officers are immune from suit "when they reasonably believe that probable cause existed, even though it is subsequently concluded that it did not, because they 'cannot be expected to predict what federal judges frequently have considerable difficulty in deciding and about which they frequently differ among themselves."

*Crowe*, 593 F.3d at 868 (internal citations omitted).

The officers' belief that probable cause was developed during the *Terry* stop is, in this Court's view, correct. Even if it that belief was mistaken, however, it was a reasonable one. The arresting officers are qualifiedly immune from this claim.

ORDER
Page - 14

The Defendants' Motion for Summary Judgment on Plaintiff's claim that probable cause to arrest him was lacking due to the wrongful procurement of a search warrant is GRANTED and this claim is DISMISSED with prejudice.

**4.      Validity of Search Warrant and Subsequent Search**.

The Plaintiff and, in response, the Defendants, devote the bulk of their briefing arguing over the circumstances of Officer King's statements to Judge Strophy, which were used to obtain a search warrant for Mr. Lynch's "major prints" and DNA.  This is, in fact, the focus[3] of plaintiff's case; he claims the warrant was obtained through misrepresentations and omissions, and that without the tainted warrant there could not have been probable cause to search or arrest him.

As an initial matter, probable cause to arrest was not based on this phone call, the resulting warrant, or on the evidence obtained in the subsequent search. Instead, Mr. Lynch was arrested based on the probable cause that was established during the *Terry* stop, described above.

The legal standards against which an officer's efforts to obtain a search warrant are well-settled.  A misrepresentation in the application constitutes a violation of the Fourth Amendment if the misrepresentation is material.  Misrepresentations can be affirmative or based on omission. Affirmative misrepresentations are material only if there is no probable cause absent consideration of the misrepresented facts.   A misrepresentation based on an omission is material only where the omitted facts "cast doubt on the existence of probable cause."  *Crowe*, 593 F.3d at 869-870, *citing Franks v. Delaware*, 438 U.S. 154, 171-172 (1978) (internal citations omitted).  If a plaintiff is able to demonstrate that a warrant was issued as the result of a material misrepresentation, a police officer defendant may still be

---

[3]Plaintiff does not appear to assert a claim based on the "major prints" search warrant itself, as a criminal defendant might if the fruits of a wrongful  search were used to prosecute him. Presumably, this is because the search led only to the DNA evidence that exonerated Mr. Lynch, and not to any detention, arrest or prosecution of him.

ORDER
Page - 15

entitled to summary judgment on qualified immunity grounds, unless the plaintiff can also demonstrate that the police officer deliberately falsified information presented to the magistrate or recklessly disregarded the truth. *Id.*

The misrepresentations and omissions relied upon by the Plaintiff here do not meet the materiality standard required to maintain a Constitutional claim, because it cannot be said that the probable cause necessary to arrest Mr. Lynch (and to obtain a warrant for his DNA) does not depend on the alleged misrepresentations (as to hair color and length, etc.). Nor does the allegedly omitted information (including Detective King's failure to inform the Judge of the photo montage and the Plaintiff's failure to identify the Plaintiff as her attacker, in connection with the second warrant) cast doubt on the probable cause to arrest already established, and discussed above.

The Plaintiff's reliance on these detailed discrepancies is therefore misplaced. Defendants point out, and the Court emphasizes that, if it was developed at all, probable cause was developed during the *Terry* stop. Probable cause to arrest did not come from Officer King's conversation with Judge Strophy, it was not the result of the search warrant he issued, and it did not result from the ensuing search. Mr. Lynch has not pointed to any statement or other evidence leading to his arrest and detention which was obtained after the search warrant was issued and executed.

Instead, the only additional piece of evidence supporting (or "bolstering") the probable cause to arrest Mr. Lynch came from the search of Mr. Lynch's backpack incident to his arrest, and the discovery of what he had written in the journal he kept there. This search was not the result of the initial search warrant, which was instead for "major prints and DNA evidence." Nor was it the result of the second, which was for his Homestead Park "bunker."

ORDER
Page - 16

The journal entries included references to Mr. Lynch's desire to "get over this f***ed up child hurter/hunter thing," his considering "raping his teacher," and his calling himself  "a horrible person."  The crime being investigated was the rape of a child near where Mr. Lynch was found, writing in a notebook.

Had Mr. Lynch refused to accompany the officers to the station initially, he would have been arrested at that time, and his back pack would have been searched incident to that arrest.  *See*, for example, *Chimel v. California*, 395 U.S. 763 (1969).  The officers' review of the journals was not the result of either search warrant.  And while the content of the journals clearly bolstered the already existing probable cause to arrest Mr. Lynch, it was found *during* that arrest; it did not *lead to* the arrest. Thus, no reasonable jury could find that the officers' conduct with respect to the search warrants was a violation of Mr. Lynch's Constitutional Rights.

And, even if such a violation could be found, the officer's are entitled to qualified immunity. Plaintiff has not and cannot establish that Detective King deliberately falsified the information given to Judge Strophy, or that she reported to him with deliberate or reckless disregard for the truth.

For these reasons, the Defendants' Motion for Summary Judgment on Plaintiff's unconstitutional search claim is GRANTED and that claim is DISMISSED WITH PREJUDICE.

**5.      Mr. Lynch's state law false arrest claims.**

Plaintiff asserts state law claims for false arrest and illegal imprisonment.  Defendant seeks summary judgment on these claims based on the existence of probable cause to arrest and detain Mr. Lynch.  Defendants correctly argue that probable cause is a complete defense to a claim for false arrest or imprisonment.  *See McBride v. Walla Walla County*, 95 Wash. App. 33 (1999).  For the reasons discussed above, probable cause was established to arrest and detain Mr. Lynch was developed early on, during the officers' *Terry* stop.  And even it was not, the officers are entitled to qualified immunity on this claim.

Defendants' Motion for Summary Judgment on Plaintiff's state law claims is GRANTED and those claims are DISMISSED with prejudice.

* * *

The Olympia Defendants' Motion for Summary Judgment [ Dkt. #58] is GRANTED, and Plaintiff's claims against these Defendants are DISMISSED with prejudice.  Plaintiff's claims against the remaining defendants are not addressed by this order.

IT IS SO ORDERED.

Dated this 13th day of May, 2010.


RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

ORDER
Page - 18